**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ex rel. Gregory Kuzma,<br><br>Plaintiff,<br><br>v.<br><br>Northern Arizona Healthcare Corporation, et al.,<br><br>Defendants. | No. CV18-8041-PCT-DGC<br><br>**ORDER** |

Relator Gregory Kuzma alleges that Defendants Northern Arizona Healthcare Corporation ("NAHC"), Northern Arizona Orthopedic Surgery Center, LLC ("NAOSC"), and Flagstaff Medical Center, Inc. ("FMC") violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*. Doc. 40. Defendants move to dismiss the amended complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. Doc. 44. The Court heard oral argument on September 25, 2020, and will grant the motion to dismiss and allow Relator to file a second amended complaint.[1]

**I.   Background.**

The Court takes the factual allegations of Relator's amended complaint as true for purposes of this motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Relator worked for

---

[1] Relator has filed a separate complaint against NAHC, FMC, and Northern Arizona Health Foundation, alleging unrelated FCA violations. Doc. 35 (No. 18-cv-8040). The Court will also issue an order granting the motion to dismiss that case with leave to amend.

NAHC from January 1992 to March 2014. Doc. 40 ¶ 2. He held various financial planning roles from 1992 to October 2004, and served as NAHC's Vice President and Chief Financial Officer for the remainder of his tenure. *Id.*

In 2013, Defendants began investigating the possibility of acquiring the assets of Summit Surgery and Recovery Care Center, Inc. ("Summit Center"), which was owned by 16 orthopedic surgeons. *Id.* at ¶¶ 25, 31-32, 35. Summit Center's assets included a 15,932 square foot surgery center, consisting of three operating rooms, five pre-operation bays, and an eight-room recovery center. *Id.* ¶ 30. The surgeons were interested in selling, in part, because of anticipated capital expenditures of up to $2 million over the following two years. *Id.* ¶¶ 36-38. Relator gathered information and documentation for a fair market valuation of Summit Center. *Id.* ¶ 39. Relator was experienced in business valuation and had performed this function for NAHC during his more than 20 years with the company. *Id.* ¶ 40. He determined that the fair market value of Summit Center was between $8 and $10 million, and shared his report with NAHC's CEO in December 2013. *Id.* ¶¶ 43, 44.

In 2015, after he had left Defendants' employment, Relator learned that, on April 1, 2015, Defendants acquired Summit Center's assets for $25.1 million – a price two to three times higher than Relator's valuation and higher than the 90th percentile of any peer comparison. *Id.* ¶¶ 42-44, 46, 54. Relator also learned that Somerset CPAs and Advisors, an independent accounting firm, had performed a fair market value analysis of Summit Center and arrived at a value of $23.9 million (plus or minus 5%), and that Defendants had paid the high end of that value. *Id.* ¶¶ 48-50.

Relator filed this FCA action alleging that Defendants' purpose in paying an inflated price for Summit Center was to reward its surgeon-owners for their past business with Defendants and to induce them to provide future business, in violation of the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b. *Id.* ¶¶ 56-58, 63-65. Relator alleges that all claims submitted to government healthcare programs for services performed by physicians at Defendants' facilities after the April 1, 2015 acquisition date violate the FCA. *Id.* ¶ 65.

Relator filed this action on February 28, 2018. Doc. 1. On November 21, 2019, the United States announced its decision not to intervene. Doc. 15. Relator filed his amended complaint on April 27, 2020, after considering Defendants' first motion to dismiss based on Rules 9(b) and 12(b)(6). *See* Docs. 35, 40.

## II.   Relevant Standards.

When analyzing a complaint for failure to state a claim to relief under Rule 12(b)(6), the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A successful motion to dismiss under Rule 12(b)(6) must show either that the complaint lacks a cognizable legal theory or fails to allege facts sufficient to support its theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint that sets forth a cognizable legal theory will survive a motion to dismiss as long as it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Because FCA claims involve allegations of fraud, they must comply with the heightened pleading requirements of Rule 9(b). *Cafasso ex rel. United States v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054-55 (9th Cir. 2011). That rule requires a party alleging fraud to "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). A "pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Cafasso*, 637 F.3d at 1055 (internal quotation marks omitted). Rule 9(b) serves dual purposes: (1) to give defendants fair notice of the allegations of fraud, so that they have an opportunity to rebut specific accusations; and (2) to deter the harm caused by unsubstantiated fraud complaints. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016).

## III.   Discussion.

Relator alleges that Defendants violated the AKS and the FCA by knowingly paying an inflated price for Summit Center in order to reward the surgeon-owners for their past

business and induce continued loyalty, and by billing the United States for services subsequently performed by the surgeons at Defendants' facilities. Doc. 40. Defendants argue that the amended complaint does not adequately plead a violation of the AKS and elements of the FCA. Doc. 45 at 6-13.[2]

### A.     The Anti-Kickback Statute.

The AKS imposes criminal penalties on a person or entity who "knowingly and willfully offers to pay remuneration to another to induce them to . . . order, or arrange for [any] service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(B). While the AKS itself provides no private right of action, the Patient Protection and Affordable Care Act made any "claim that includes items or services resulting from a violation of [the AKS] . . . a false or fraudulent claim for the purposes of [the FCA]." 42 U.S.C. §§ 1320a-7b(g). "The elements of the [AKS] violation must . . . be pleaded with particularity under Rule 9(b) because they are brought as a [claim under the FCA]." *United States v. Abundant Life Therapeutic Servs. Tex., LLC*, 2019 WL 1930274 at *6 (S.D. Tex., Apr. 30, 2019) (citation omitted).

### 1.     Fair Market Value.

Defendants contend that they paid fair market value for Summit Center and therefore could not have violated the AKS. Doc. 45 at 6 (citing *United States ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1049 (N.D. Ill. 2002) ("To comply with the AKS, the hospital must simply pay fair market value for the practice's assets.")). In order to allege a kickback under the AKS, "the complaint must particularly allege facts showing that" the acquisition was "not commercially reasonable." *Obert-Hong*, 211 F. Supp. 2d at 1049.

While it is true that the price Defendants paid for Summit Center was within the fair market value range identified by Somerset, Relator argues that "Somerset's valuation was plainly and materially wrong in ways that Defendants knew or, at a minimum, that

---

[2] Citations are to page numbers placed at the top of each page by the Court's electronic filing system.

- 4 -

Defendants acted in reckless disregard of the truth." Doc. 46 at 12. Relator is a CPA with significant experience in business valuation, including valuations he performed while employed by Defendants. Doc. 40 ¶¶ 1, 2, 40. In 2013, Relator conducted a fair market value analysis of Summit Center, consistent with applicable federal and industry standards. *Id.* ¶ 41. He concluded the Center was worth between $8 and $10 million and shared this valuation with NAHC's CEO. *Id.* ¶¶ 43-44. The combined equity value of the 16 surgeons who owned Summit Center was about $7.2 million, and the surgeons were interested in selling, in part, because they knew Summit Center would require capital expenditures in the next two years. *Id.* ¶¶ 31-36. The surgeon-owners were an important profit center for Defendants NAHC and FMC. *Id.* ¶ 34. Orthopedic surgery (their specialty) was among the top two or three profit centers each year for FMC, and accounted for 17.5% of NAHC's inpatient cases in 2011 and 2012. *Id.* ¶¶ 34, 63.

Relator's amended complaint includes specific reasons why Somerset's valuation was not commercially reasonable. He alleges that it included overstated historical operating income and net revenue, a future operating income projection that was inconsistent with historical performance, future case volume projections that were inconsistent with historical performance, understated future capital expenditures, and overstated present value. Doc. 40 ¶ 53(a)-(e). Correcting these errors brings the Somerset valuation in line with Relator's fair market value of $8 to $10 million. *Id.* ¶ 55.

Relator provides factual detail to support his assertions. For example, the Somerset valuation projected only $100,000 in capital expenditures in the two years after acquisition (*id.* ¶ 53(d)), while the surgeon-owners themselves anticipated capital expenditures of $2 million (*id.* ¶ 38, 53(d)). The amended complaint explains: "The [Summit Center] was nearly 15 years old and had a variety of equipment that was at the end of its economic useful life and in need of replacement, including: four anesthesia machines at $250,000 or $300,000 apiece; laparoscopic equipment and cameras with an estimated replacement cost of $400,000; operating room lights; and computer systems that needed upgrades." *Id*. ¶ 37. In fact, Defendants spent more than $1 million on capital expenditures at Summit Center

during the first quarter after they purchased it.  *Id.* ¶ 53(d).  Additionally, the difference between the historical operating income data used by Relator and the figures used by Somerset was $14 million.  *Id.* ¶ 55(a).

Construing the evidence in the light most favorable to Relator, the Court cannot conclude that the amended complaint fails to plead a violation of the AKS simply because Defendants paid a price that fell within Somerset's fair market value.  *Cousins*, 568 F.3d at 1067.  Relator alleges facts that, if true, show Somerset's valuation was far from accurate, Defendants knew or had reason to know it was not accurate, and Defendants nonetheless overpaid for the facility.  The Court finds the allegations of an AKS violation to be plausible.

### 2. Rule 9(b)'s Particularity Requirement.

Relying on Rule 9(b), Defendants argue that "Relator must plead not just the specific Somerset CPAs numbers with which he disagrees, but also particularized facts supporting his allegation that Somerset CPAs' valuation was fraudulent."  Doc. 45 at 7.  To the extent Defendants suggest that Relator must show *Somerset* committed fraud in valuing Summit Center, the Court does not agree.  Relator must show that Defendants committed fraud – that they knew the valuation by Somerset was overstated and yet paid the inflated price anyway.  *See* 31 U.S.C. § 3729(a).

Defendants contend that Relator's disagreement with Somerset's valuation is insufficient to establish fraud.  Docs. 45 at 7, 47 at 2.  But as already noted, the amended complaint contains more than Relator's disagreement.  In addition to the anticipated capital costs discussed above, Relator alleges that the surgeon-owners' total equity contribution to Summit Center was $7.2 million in 2011 and that there was a 10% increase in surgeries the following year, suggesting only a modest increase in the Center's value.  Doc. 40 ¶¶ 31-33.  Relator notes that the prevailing industry multiple of 6.0 to 7.9 times earnings before interest, taxes, depreciation, and amortization would value Summit Center at between $8 and $9 million.  *Id.* ¶ 42.  He also alleges that Somerset's valuation was higher than 90% of relevant peer comparisons.  *Id.* ¶ 54.  These facts do not "simply label a few of Somerset

CPAs' assumptions and projects as flawed." Doc. 45 at 8. They provide a particularized factual basis for Relator's claims.

Defendants also argue that Relator does not present "any contemporaneous facts whatsoever concerning Somerset CPAs' analysis." *Id*. The Court disagrees. In order to value the business for NAHC in 2013, Relator was given access to relevant Summit Center data through the end of 2013. Doc. 40 ¶ 39. When he compared that data with the Somerset valuation done less than two years later, he found that Somerset overstated Summit Center's operating income by two to three times. "The Somerset valuation lists operating income in 2012 and 2013 as $4.3 million and $3.6 million respectively, but, based on Relator's review of the relevant data, [Summit Center] only produced historic operating income in the $1.2 million to $1.5 million range." *Id.* ¶ 53(a).

Defendants argue that impairment charges NAHC took on Summit Center's assets in the years following the acquisition are not evidence that Defendants knowingly overpaid for the Center at the time. Docs. 45 at 9-10, 47 at 5-6. Impairment charges are taken on a company's financial statements when the fair market value of an asset is deemed to be unrecoverable under Generally Accepted Accounting Principles. Doc. 40 ¶ 60. The impairment charge allegations alone are not enough to establish that the Summit Center price was inflated, considering that "real estate values can be variable, and that fluctuations in prices over a period of years are not necessarily unusual, nor are they conclusive proof of wrongdoing." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014). But the impairment charges are relevant, and Relator does not rely on them alone, as shown above.

In summary, Relator cites industry metrics that Defendants do not challenge, lists errors that form the basis of Somerset's analysis, and alleges that Defendants' agreed to pay the inflated price to reward the surgeons. *Id.* ¶¶ 52-56. These facts are sufficient for the Court to draw a reasonable inference that there was a kickback in the form of a commercially unreasonable acquisition price in violation of the AKS. *See Obert-Hong*, 211 F. Supp. 2d at 1049.

### 3. Collective Liability.

Defendants contend that the amended complaint "fails to plead with particularity each Defendant's role in the purported fraud, or to identify an individual employee who took (or failed to take) any particular action" as required by Rule 9(b). Docs. 45 at 10, 47 at 6. The amended complaint identifies three defendants: NAHC, NAOSC, and FMC, and alleges that NAOSC and FMC are wholly owned subsidiaries of NAHC. Doc. 40 ¶¶ 3-5. Relator asserts that at "all relevant times, all actual and/or apparent agents of NAHC, NAOSC and FMC are employees solely of NAHC" and that "FMC provided the funds used by NAOSC to acquire [Summit Center's] assets and the individuals responsible for negotiating and consummating the transaction were NAHC officers and/or employees." *Id.* ¶¶ 6, 47. Relator asserts that because the three Defendants "engaged in a common fraudulent scheme to further their collective financial interest," he is not required to state specific allegations against each Defendant. Doc. 46 at 17-18. The Court agrees, in part.

"Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *United Healthcare*, 848 F.3d at 1184 (quotation marks and citation omitted). "There is no flaw in a pleading, however, where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *Id.*

Relator's allegations are sufficient with respect to the AKS violation. He alleges that all three Defendants engaged in a single kickback – paying the surgeon-owners a significantly inflated price for Summit Center to induce them to continue doing business with Defendants. *See*, *e.g.*, Doc. 40 ¶ 56. He identifies the relationships between the parties and the role each played in the kickback (NAHC employees negotiated and consummated the transaction, FMC provided the money, and NAOSC acquired Summit Center). *Id.* ¶¶ 3-5, 46-47. This was not a series of events over a prolonged period, but one transaction completed on a specific date. Relator appropriately used "collective allegations . . . to

describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *Id.*<sup>3</sup>

The collective allegations fall short, however, in their assertion of false claims. They say nothing about the roles of NAHC, FMC, and NAOSC in making allegedly false claims or false statements in support of claims, the persons by whom the false claims and statements were made, when they occurred, or how they were false. More will be said of this shortcoming below.

### B. The False Claims Act.

Defendants contend that the amended complaint fails to plead elements of the FCA. Doc. 45 at 11. Relator alleges violations of 31 U.S.C. § 3729(a)(1)(A) and (B), which create liability for any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." The elements of § 3729(a)(1)(A) and (B) are "virtually identical, with the only difference being whether Defendants submitted a false claim or made a statement material to such a claim[.]" *McGrath v. Microsemi Corp.*, 140 F. Supp. 3d 885, 894 (D. Ariz. 2015), *aff'd*, 690 F. App'x 551 (9th Cir. 2017) (citation omitted).

Defendants argue that "Relator fails to identify a single claim for services performed by Defendants, much less one linked to these particular physicians and the alleged kickback, nor does he offer any reason to believe such claims were submitted." Doc. 45 at 12-13. Relator responds that he has "linked Defendants' violation of the AKS to false claims submitted for reimbursement" because the taint of a kickback renders every reimbursement claim fraudulent. Doc. 46 at 20.

The parties do not address in any detail the requirements for an FCA claim based on a violation of the AKS. Courts have wrestled with the question of whether a relator

---

<sup>3</sup> Defendants argue that the claims against NAHC should be dismissed because Relator fails to identify specific employees involved in the alleged fraud. Docs. 45 at 10, 47 at 7-8. But Relator identifies NAHC's CEO as the person with specific knowledge of Relator's 2013 report and involvement with the transaction. *See* Doc. 40 ¶¶ 44, 47.

- 9 -

must plead and prove that the AKS violation – the kickback – caused the claims at issue under the FCA. Applied to this case, the question is whether Relator must prove that the physician services billed to the federal government as allegedly false claims resulted from the kickback in the purchase of Summit Center. Although the Court has not conducted exhaustive research, it appears that most courts reject the suggestion that a relator must prove "but for" causation – that a false claim would not have been made without the kickback. *See*, *e.g.*, *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 100 (3d. Cir. 2018); *United States ex rel. Bawduniak v. Bioden Idec, Inc.*, 2018 WL 1996829 at *5-6 (D. Mass., Apr. 27, 2018); *United States ex rel. Kester v. Novartis Pharm. Corp.*, 41 F. Supp. 3d 323, 332 (S.D.N.Y. 2014).

But the cases do not appear to have settled on a single standard for what a relator must plead and prove with respect to the AKS and FCA, and the parties cite no Ninth Circuit case on point. One leading case, the Third Circuit's *Greenfield* decision, rejects "but for" causation, but also states that "[a] kickback does not morph into a false claim unless a particular patient is exposed to an illegal recommendation or referral and a provider submits a claim for reimbursement pertaining to that patient." 880 F.3d at 100. *Greenfield* states that there must be "a link between the alleged kickback and the medical care," but does not describe the nature of the link. *Id.*; *see also United States ex rel. Dan Abrams Co. v. Medtronic, Inc.*, 2018 WL 5266863, at *8 (C.D. Cal., June 7, 2018) (complaint must "allege a clear link between any alleged inducements and the false claims"). Other courts hold that a mere temporal sequence is enough: "[i]t is sufficient to show that Defendant paid kickbacks to a physician for the purpose of inducing the physician to prescribe specific drugs, and that the physician then prescribed those drugs, even if the physician would have prescribed those drugs absent the kickback." *Bawduniak*, 2018 WL 1996829 at *3.

Nor have courts identified the nature of the false statement that must be made to constitute a false claim based on violation of the AKS. Some cases have noted that the defendant, in submitting claims to the government, specifically certified that the claims

complied with the AKS. *Greenfield*, 880 F.3d at 92. Other courts, including the Ninth Circuit, have recognized an "implied certification" approach to the FCA, which "occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).[4] The Supreme Court has stated that an implied certification theory can be a basis for liability where at least two conditions are satisfied: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016).

The parties do not address these requirements, and the Court will not attempt to settle them for all purposes in this case without further briefing. But the Court does conclude that Relator has failed sufficiently to plead the existence of false claims. The amended complaint alleges "[u]pon information and belief" that "Defendants have continued to submitted [sic] thousands of claims annually for payments for surgeries and other services performed or referred by physicians at Defendant's facilities since April 1, 2015." Doc. 40 ¶ 62. He alleges that Defendants violated the AKS "and, therefore, claims submitted to government healthcare programs for payment for surgeries and other services performed by these physicians at Defendants' facilities after April 1, 2015, violate the FCA." *Id.* ¶ 65.

The Ninth Circuit has held that "'Rule 9(b) does not require a relator to allege the details of every false claim submitted to the federal government for reimbursement, so long as he alleges particular details of a scheme to submit false claims paired with reliable

---

[4] Some cases note that Medicare claims must include an acknowledgement on CMS Form 855s that the claims are subject to the AKS. *Greenfield*, 880 F.3d at 92 n.3. Others note that "[c]ompliance with the AKS by a party is a prerequisite to its receiving payment from federally funded healthcare programs, including Medicaid and Medicare." *Dan Abrams Co.*, 2018 WL 5266863, at *8 (C.D. Cal. June 7, 2018).

- 11 -

indicia that lead to a strong inference that claims were actually submitted.'" *United States ex rel. Solis v. Millennium Pharm., Inc.*, 885 F.3d 623, 628–29 (9th Cir. 2018) (quoting *United Healthcare*, 848 F.3d at 1180) (quotation marks omitted). Relator describes the alleged AKS violation in some detail, as discussed above, but he does not "allege particular details" of the scheme to submit false claims, nor provide "reliable indicia" that false claims were in fact submitted. Indeed, he says almost nothing about the false claims, asserting only on information and belief that billings for physician services occurred after Defendants' purchase of Summit Center. Doc. 40 ¶ 62. This is not sufficient to satisfy Rule 9(b), even under the somewhat relaxed interpretation adopted by the Ninth Circuit in *United Healthcare* and other cases.

The Court will dismiss Relator's amended complaint for failure to satisfy Rule 9(b), but will permit him to file a second amended complaint. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1108 (9th Cir. 2003). Relator is cautioned, however, that the Court likely will not allow a third amended complaint. Plaintiff laid out his claims in an original complaint, and then amended the complaint after he saw Defendants' first motion to dismiss. He will now be given a third opportunity to plead his claims. If he cannot plead a viable claim in three attempts, further attempts likely will be futile.[5]

**IT IS ORDERED** that Defendants' motion to dismiss (Doc. 44) is **granted**. The amended complaint is dismissed without prejudice. Relator may file a second amended complaint within 21 days of this order. If Defendants choose to file a motion to dismiss the second amended complaint, they shall file a single joint motion, within 14 days of the amended complaint, and shall limit the motion to 12 pages. Relator shall file a response

---

[5] In light of the defects identified above, the Court need not address Defendants' argument that the amended complaint fails adequately to allege scienter. Docs. 45 at 13, 47 at 9. Relator should nonetheless consider Defendants' argument seriously in framing his second amended complaint.

within 14 days, also limited to 12 pages. Defendants shall file a reply within 7 days, limited to 8 pages. The parties shall call the Court to advise it when briefing on the motion has been completed.

Dated this 30th day of September, 2020.

David G. Campbell
Senior United States District Judge