**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ex rel. Gregory Kuzma,<br><br>Plaintiff,<br><br>v.<br><br>Northern Arizona Healthcare Corporation, et al.,<br><br>Defendants. | No. CV18-8041-PCT-DGC<br><br>**ORDER** |

Defendants Northern Arizona Healthcare Corporation ("NAHC"), Northern Arizona Orthopedic Surgery Center, LLC ("NAOSC"), and Flagstaff Medical Center, Inc. ("FMC") have filed a motion to dismiss Relator's second amended complaint ("SAC"). Doc. 61. The motion is fully briefed, and oral argument will not aid the Court's decision. Fed. R. Civ. P. 78(b); LRCiv 7.2(f). The Court will deny the motion.

**I.    Background.**

The Court takes the factual allegations of the SAC as true for purposes of this motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). NAHC, a nonprofit corporation, operates the largest healthcare system in northern Arizona. Doc. 56 ¶ 3. NAOSC and FMC are wholly-owned subsidiaries of NAHC and operate an ambulatory surgery center and hospital, respectively. *Id.* ¶¶ 4-5.

Relator worked for NAHC from January 1992 to March 2014. *Id.* ¶¶ 2-3. He held various financial planning roles from 1992 to October 2004, and served as NAHC's Vice President and Chief Financial Officer for the last 10 years of his tenure. *Id.*

In 2013, Defendants began investigating the possibility of acquiring the assets of Summit Surgery and Recovery Care Center, Inc. ("Summit Center"), which was owned by 16 physicians – 14 orthopedic surgeons and 2 physical medicine and rehabilitation doctors. *Id.* ¶¶ 25, 35. Summit Center was nearly 15 years old and required substantial equipment replacement. *Id.* ¶ 37. The surgeons wanted to sell Summit Center, in part, because anticipated capital expenditures could reach $2 million over the following two years. *Id.* ¶¶ 36-38.

Relator gathered information and documentation for an independent fair market value analysis of Summit Center. *Id.* ¶ 39. He was experienced in business valuation and had performed that function for NAHC in his more than 20 years with the company. *Id.* ¶ 40. Based on financial statements and other data, Relator determined that the fair market value of Summit Center was between $8 and $10 million, and shared his report with NAHC's CEO in mid-December 2013. *Id.* ¶¶ 39, 43-44.

In the summer of 2014, after he had left Defendants' employment, Relator became aware of further discussions regarding Defendants' acquisition of Summit Center. *Id.* ¶ 46. He told Hope Wade, NAHC's Director of Financial Planning, to review his 2013 report and supporting documentation. *Id.* Wade told Relator that she had located the file, reviewed it, and provided it to FMC's then-CEO, Richard Langosch. *Id.* ¶ 47.

In November 2014, the NAHC Board of Directors approved the purchase of Summit Center. *Id.* ¶ 48. Relator later learned that Defendants paid $25.1 million for its assets – a price two to three times higher than Relator's valuation and higher than the 90th percentile of any peer comparison. *Id.* ¶ 49. FMC provided the funds used by NAOSC to acquire Summit Center's assets, and NAHC employees negotiated and finalized the transaction. *Id.* ¶ 50. Relator also learned that Somerset CPAs and Advisors, an independent accounting firm, had performed a fair market valuation of Summit Center and arrived at a value of

$23.9 million (plus or minus 5%), and that Defendants paid the high end of that value ($23.9 million plus 5% is $25.095 million, and Defendants paid $25.1 million). *Id.* ¶¶ 51-53.

Relator filed this action in February 2018, alleging that Defendants violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, by paying an inflated price in order to reward the surgeon-owners of Summit Center for their past business with Defendants, and to induce them to provide future business in violation of the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b. *Id.* ¶¶ 56-58, 63-65. Relator alleges that all claims submitted to government healthcare programs for services performed by the physicians at Defendants' facilities after the April 1, 2015 acquisition date violated the FCA. *Id.* ¶ 65.

On November 21, 2019, the United States announced its decision not to intervene. Doc. 15. Relator filed a first amended complaint ("FAC") on April 27, 2020, after considering Defendants' first motion to dismiss based on Rules 9(b) and 12(b)(6). *See* Docs. 35, 40. In September 2020, the Court dismissed the FAC for failure to plead with particularity under Rule 9(b) and granted Relator leave to amend. Doc. 54. Relator filed the SAC on October 21, 2020. Doc. 56.

**II.   Legal Standard.**

Because FCA claims involve allegations of fraud, they must comply with the heightened pleading requirements of Rule 9(b). *Cafasso ex rel. United States v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054-55 (9th Cir. 2011). That rule requires a party to "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). A "pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Cafasso*, 637 F.3d at 1055 (internal quotation marks omitted).

The AKS imposes criminal penalties on a person or entity who "knowingly and willfully offers to pay remuneration to another to induce them to . . . order, or arrange for [any] service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(B). While the AKS itself creates no

private right of action, the Patient Protection and Affordable Care Act made any "claim that includes items or services resulting from a violation of [the AKS] . . . a false or fraudulent claim for the purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g). Because they are brought as a claim under the FCA, the elements of an AKS violation must be pleaded with particularity under Rule 9(b). *United States v. Abundant Life Therapeutic Servs. Tex., LLC*, No. H-18-773, 2019 WL 1930274 at *6 (S.D. Tex. Apr. 30, 2019) (citation omitted).

### III.   Discussion.

Defendants argue that the SAC should be dismissed because Relator has not sufficiently alleged scienter under the AKS. Doc. 62 at 1-2.[1] Alternatively, Defendants argue that NAHC should be dismissed from the action because the SAC fails to allege that it submitted a false claim or statement. *Id.* at 2.

Defendants' briefs read like a closing jury argument or summary judgment motion. The question in this motion to dismiss, however, is not whether Relator's allegations are persuasive or even meet a probability standard. *Iqbal*, 556 U.S. at 678. The question is whether his factual allegations, taken as true and construed in his favor, state a plausible claim for relief. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). The SAC satisfies this standard.

#### A.   Scienter.

Under Rule 9(b), "circumstances constituting fraud or mistake must be stated with particularity, but malice, intent, knowledge, and other conditions of a person's mind, including scienter, can be alleged generally." *United States v. Corinthian Colleges*, 655 F.3d 984, 996 (9th Cir. 2011) (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009)). The AKS and FCA have different scienter requirements. The FCA requires that a defendant act "knowingly," defined as acting either with actual knowledge, in deliberate ignorance of the truth or falsity of the information, or in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A). The AKS

---

[1] Citations are to page numbers placed at the top of each page by the Court's electronic filing system.

requires that a defendant act "knowingly and willfully," 42 U.S.C. § 1320a-7b(2)(B), but "a person need not have actual knowledge of [the AKS] or specific intent to commit a violation of [it]," *id.* § 1320a-7b(h).

Defendants contend that the SAC fails to allege scienter under the AKS, even if certain allegations may meet the more relaxed FCA standard. Doc. 62 at 7. Relator focuses on the FCA scienter standard, arguing that the SAC alleges several facts giving rise to a plausible inference that Defendants acted with "reckless disregard, at a minimum." Doc. 63 at 10.

Because Relator's FCA claims are predicated on "a violation" of the AKS, 42 U.S.C. § 1320a-7b(g), and such a violation requires knowing and willful action, *id.* § 1320a-7b(2)(B), the Court concludes Relator must plead that Defendants committed a knowing and willful violation of the AKS – an issue that neither the parties nor the Court addressed previously.[2] But because this is an averment of scienter, it need not be pleaded with particularity – a general allegation will suffice under Rule 9(b). *Corinthian Colleges*, 655 F.3d at 996. The Court finds that the factual allegations in the SAC plausibly and generally allege a knowing and willful violation of the AKS by Defendants.

During Relator's tenure as NAHC's CFO, the company learned through its work with a financial advisor that healthcare valuations were generally in the range of .80 to 1.1 times the net revenue for healthcare transactions – far below what Defendants agreed to pay for Summit Center. Doc. 56 ¶ 64. Relator shared a summary of his valuation with NAHC's CEO in mid-December 2013. *Id.* ¶ 44. After leaving NAHC, Relator told Wade, NAHC's Director of Financial Planning, to review his valuation and supporting documentation. *Id.* ¶ 46. Wade told Relator that she reviewed the file and provided it to Langosch, FMC's then-CEO, showing that Defendants were aware that the true valuation of Summit Center was between $8 and $10 million. *See id.* ¶ 47. Relator also alleges that Karla Jacobsen, who joined NAHC as a senior staff accountant between the final approval

---

[2] In their previous motion to dismiss, Defendants addressed the scienter requirement as it pertained to the FCA only. *See* Doc. 45 at 13.

of the Summit Center deal and its formal closing, told individuals at NAHC that Summit Center was not worth the price NAOSC agreed to pay. *Id.* ¶¶ 49, 63. Jacobsen was familiar with Summit Center's financial condition, having previously served as CFO of Summit Center's managing organization. *See id.* ¶ 63.

Relator also alleges that Defendants' overpayment made little sense under the circumstances. Defendants were not in competition with any other prospective buyer of the surgery center. *Id.* ¶ 59. NAHC was a "sophisticated business organization" familiar with due diligence processes and industry standards for conducting accurate valuations. *Id.* ¶ 66; Doc. 63 at 10-11. "Any legitimate due diligence" would have entailed a review of Summit Center's tax returns and financial statements prior to the acquisition, thus revealing Somerset CPAs' inflated valuation. Doc. 56 ¶ 62.

Additionally, Medicaid's implementing agency had not adjusted rates to account for inflation for nearly two years, and had twice decreased rates for services to Medicaid patients. *Id.* ¶ 65. This increased pressure on Defendants' margins, Relator alleges, and made it implausible that Defendants would pay an inflated price for Summit Center's assets without being assured of a return on their investment. *Id.* ¶ 66.

Defendants claim that several of these allegations – including what a "legitimate due diligence" process would have revealed and the purported pressure on Defendants' margins – are too speculative to pass Rule 9(b) muster. Doc. 62 at 6. The Court disagrees. Relator's personal knowledge as NAHC's Vice President and CFO for nearly 10 years before this transaction, his familiarity with how NAHC performed due diligence of such transactions, and his knowledge of industry valuation standards plainly raise these allegations above the level of speculation. The allegations are clearly probative of scienter. *See United States ex rel. Arnstein et al v. Teva Pharmaceuticals USA, Inc*., 13 Civ. 3702 (CM), 2019 WL 1245656, at *9 (S.D.N.Y. Feb. 27, 2019) (in FCA case arising from AKS violations, inference of scienter was supported by evidence that defendant violated its own policies and industry standards); *United States ex rel. Obert-Hong v. Advocate Health Care,* 211 F. Supp. 2d 1045, 1049 n.3 (N.D. Ill. 2002) (a court may "infer that any excess

over fair value is intended to induce referrals" under the AKS) (citing *United States v. Lipkis*, 770 F.2d 1447 (9th Cir. 1985)).[3]

Relator's response memorandum and some paragraphs of the SAC refer to the recklessness standard that applies generally in an FCA case, but not in an FCA case predicated on a violation of the AKS as discussed above. *See* Doc. 63 at 10, Doc. 56 ¶ 66. The Court does not find these conclusory assertions of the incorrect standard to be dispositive. The key question is whether the SAC "contain[s] sufficient *factual matter*, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (emphasis added; quotation marks omitted). The SAC satisfies this standard.[4]

### B.   NAHC's Submission of False Claims.

The Court dismissed the FAC for failure to plead the existence of false claims, observing that Relator alleged "almost nothing about the false claims, asserting only on information and belief that billings for physician services occurred after Defendants' purchase of Summit Center." Doc. 54 at 12; *see also United States ex rel. Solis v. Millennium Pharms., Inc.*, 885 F.3d 623, 628–29 (9th Cir. 2018) (under Rule 9(b), a relator must "allege[ ] particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.") (internal citations and quotation marks omitted).

---

[3] Defendants claim that Relator "makes no allegation anywhere in the SAC that NAHC violated any of its own due diligence policies or industry standards." Doc. 64 at 4. But Relator alleges that Defendants knew industry standards for valuations – standards that produced a much lower value for Summit Center (Doc. 56 ¶ 64), and that Defendants would have learned several facts through a reasonable due diligence that would have revealed the inflated price they were paying for Summit Center. *Id.* ¶¶ 61-64.

[4] The SAC's scienter allegations are not limited to recklessness. Relator also alleges that Defendants' "intent" was to induce the surgeons to continue doing business with them (Doc. 56 ¶¶ 60, 66, 67) and that NAHC "knew" the true value of Summit Center was .80 to 1.1 times net revenue, far below what it paid (*id.* ¶ 64). The SAC also alleges that Defendants consistently engaged in a "pattern" of excessive physician compensation in order to induce loyalty. *Id.* ¶¶ 67-68. Defendants argue that these allegations are both irrelevant and inadmissible under the Federal Rule of Evidence 404(b). Doc. 62 at 6-7. Admissibility may be considered at the summary judgment stage, *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002), but the Court will not make evidentiary rulings at the pleading stage. The Court notes, however, that such "other act" evidence is admissible under Rule 404(b) to prove scienter-related matters such as motive, intent, knowledge, and absence of mistake. *See* Fed. R. Evid. 404(b)(2).

Defendants appear to concede that the SAC identifies the relevant false claims and statements made to the government by two of the Defendants, FMC and NAOSC. Doc. 62 at 12-13. FMC submitted CMS Form 1450/UB04 to the federal government, in which it certified that it did not "knowingly or recklessly disregard or misrepresent or conceal material facts." Doc. 56 ¶¶ 86, 94. NAOSC submitted CMS Form 1500, in which it certified that it complied with all applicable Medicare and Medicaid laws, including the AKS. *Id.* ¶¶ 89-91. Both entities also certified and submitted Medicare Enrollment Applications representing that they would abide by relevant federal laws, including the AKS. *Id.* ¶¶ 93-97. These statements were false, Relator alleges, because both Defendants sought payment for services resulting from unlawful referrals. *Id.* The SAC also identifies the services for which FMC and NAOSC sought reimbursement from the government – the number of surgeries performed on Medicare beneficiaries, the nature of those surgeries, and how Summit Center's physician-owners were involved in billing Medicare for the procedures. *See id.* ¶¶ 79-83.

Defendants argue that the claims against NAHC must be dismissed because the SAC does not identify any false claims or statements made by NAHC. Doc. 62 at 9-13. Instead, the SAC alleges that NAHC is liable because it employed the individuals acting on behalf of the other two Defendants. Doc. 56 ¶¶ 7, 101; Doc. 63 at 16. Defendants characterize this as a legal conclusion about derivative liability couched as a factual allegation. Doc. 62 at 10 n.3. They contend that "merely [b]eing a parent corporation of a subsidiary that commits a FCA violation, without some degree of participation by the parent in the claims process, is not enough to support a claim against the parent for the subsidiary's FCA violation." Doc. 64 at 6 (quoting *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.,* 498 F. Supp. 2d 25, 59–60 (D.D.C. 2007)) (internal citations and quotation marks omitted). For two reasons, the Court does not agree with Defendants' argument.

First, while generalized allegations against a parent corporation will not satisfy Rule 9(b) where they consist of "bare assertion[s]" failing to allege any "degree of

participation by the parent in the claims process," *United States ex rel. Martinez v. KPC Healthcare, Inc.*, No. 8:15-cv-01521-JLS-DFM, 2017 WL 10439030, at *6 (C.D. Cal. June 8, 2017), Relator does not allege that NAHC is merely a parent corporation of FMC and NAOSC. Relator alleges that NAHC actually employed the various individuals who negotiated and finalized the Summit Center acquisition and submitted fraudulent claims to the federal government. Doc. 56 ¶ 7 ("At all relevant times, all actual and/or apparent agents of NAHC, NAOSC and FMC were (and are) employees solely of NAHC and are governed by NAHC employee policies."). This is a factual allegation, not a legal conclusion as Defendants contend, and the Court must accept it as true for purposes of this motion. This allegation distinguishes Relator's claims from mere parent-liability pleadings based on a parent corporation's ownership of the stock of a subsidiary corporation. Defendants do not dispute that NAHC can be held liable for conduct committed by its employees within the course and scope of their employment.

Second, the FCA holds a defendant liable if it pursues a scheme that ultimately results in the submission of a false claim, even if the defendant does not participate in the actual submission of the claim. 31 U.S.C. § 3729(a)(1)(A)-(B); *see also United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001) (FCA liability is not limited to those who present false claims to the government, but includes "any person who knowingly assisted in causing the government to pay claims which were grounded in fraud without regard to whether that person had direct contractual relations with the government.") (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544-45 (1943)). The SAC alleges that NAHC was directly involved in a scheme to pay kickbacks to surgeons in order to induce them to continue doing business with it, and to submit claims to the federal government for payment of the resulting services performed by those surgeons at Defendants' facilities.

**IT IS ORDERED** that Defendants' motion to dismiss (Doc. 61) is **denied.**

Dated this 13th day of January, 2021.

David G. Campbell
Senior United States District Judge