**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gregory Kuzma, | No. CV-18-08041-PCT-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Northern Arizona Healthcare Corporation, Northern Arizona Orthopedic Surgery Center LLC, and Flagstaff Medical Center Incorporated, | |
| Defendants. | |

Relator Gregory Kuzma has filed a qui tam action against Defendants Northern Arizona Healthcare Corporation ("NAHC"), Northern Arizona Orthopedic Surgery Center LLC ("NAOSC"), and Flagstaff Medical Center Inc. ("FMC"), alleging violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*. Doc. 56. Defendants move for summary judgment. Doc. 86. The motion is fully briefed (Docs. 86, 88, 89, 94) and the Court held oral argument by video conference on June 2, 2022. For reasons stated below, the Court will deny Defendants' motion in part and grant it in part.

**I.    Background.**

This case arises out of Defendants' acquisition of the Summit Surgery and Recovery Care Center (the "Summit Center") in 2014. NAHC is the largest health system in northern Arizona and the parent company of wholly owned subsidiaries NAOSC and FMC. Doc. 56 ¶¶ 3-5. Relator was employed by NAHC in various

1  financial planning roles beginning in 1992 and served as its Vice President and Chief
2  Financial Officer from 2004 to 2014.  *Id.* ¶ 2.

3        In 2013, Defendants began investigating the possibility of acquiring the assets of
4  the Summit Center, then owned by 16 physicians (the "physician-owners").  *Id.* ¶ 35; *see*
5  *also* Doc. 87-1 at 2-3 (letter of intent dated December 18, 2013).  While still employed by
6  NAHC, Relator conducted a high-level business valuation of the Summit Center,
7  concluding that it had a fair market value of approximately $8 to $10 million.  Doc. 89
8  ¶ 70.  On December 31, 2014, Defendants entered into an agreement to purchase the
9  Summit Center's assets for $25,120,000.  Doc. 87-16 at 4.  The agreement provided a
10  closing date of March 31, 2015.  *Id.* at 22.  Relator, who was no longer employed at
11  NAHC, learned of the purchase price and became concerned that it was an excessive
12  overpayment.  Doc. 89 ¶ 70.

13        Relator brought suit against Defendants, alleging they violated the FCA by
14  overpaying the physician-owners of the Summit Center to reward them for past business
15  and to induce future business in violation of the federal Anti-Kickback Statute ("AKS"),
16  42 U.S.C. § 1320a-7b.  Relator alleges that claims submitted to government healthcare
17  programs for services performed by the physician-owners at Defendants' facilities after
18  April 1, 2015, violate the FCA.  Doc. 56 ¶ 74.  Following the conclusion of discovery,
19  Defendants moved for summary judgment.  Doc. 86.

20  **II.    Summary Judgment Standard.**

21        A party seeking summary judgment "bears the initial responsibility of informing
22  the district court of the basis for its motion, and identifying those portions of [the record]
23  which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*
24  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the
25  evidence, viewed in the light most favorable to the nonmoving party, shows "that there is
26  no genuine dispute as to any material fact and the movant is entitled to judgment as a
27  matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a
28  party who "fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**III.    Statutory Framework.**

The essential elements of an FCA claim are (1) a false statement or fraudulent course of conduct, (2) made with requisite scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due.  31 U.S.C. § 3729(a)(1); *United States v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011).

The AKS imposes criminal penalties on a person or entity who "knowingly and willfully offers to pay remuneration to another to induce them to . . . order, or arrange for [any] service, or item for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b)(2)(B).  The AKS does not create a private cause of action, but under the Patient Protection and Affordable Care Act "a claim that includes items or services resulting from a violation of [the AKS] . . . constitutes a false or fraudulent claim for purposes of [the FCA]."  *Id.* at § 1320a-7b(g).

**III.    Defendants' Motion for Summary Judgment.**

Defendants advance three arguments in favor of summary judgment: (1) the acquisition price paid for the Summit Center was fair market value; (2) Relator has no evidence that Defendants acted with the requisite scienter; and (3) Relator cannot show a causal link between the alleged kickback the submission of false claims.  Doc. 86-1 at 5-6.  The Court will address each argument in turn.

**A.    Fair Market Value.**

Defendants argue that Relator cannot prove that the price paid for the Summit Center exceeded its fair market value.  Doc. 86-1 at 12-13.  Defendants note that they hired experienced and qualified outside counsel to assist with the transaction, and that outside counsel engaged Somerset CPAs ("Somerset") to provide a fair market valuation

of the Summit Center and Coker Group ("Coker") to provide a limited review of Somerset's work and a strategic analysis of the transaction. *Id.* at 13. Somerset provided a report dated September 9, 2014 (the "Somerset Valuation"), which concluded that the fair market value of a 100% interest in the Summit Center was between $22,720,000 and $25,120,000. Doc. 87-8 at 5. Defendants rely heavily on the Somerset Valuation, arguing that it is the only fair market valuation in the record and reflects "a nine-month engagement by a professional, independent accounting firm which arrived at a conclusion of value in compliance with professional industry standards." Doc. 86-1 at 13. Defendants argue that discovery has not shown that Somerset was unqualified or incompetent to perform the valuation, that Somerset failed to comply with industry standards, that Defendants attempted to influence the valuation, or that the Somerset Valuation included the value of future referrals from the physician-owners. *Id.* at 13-14. Because the ultimate purchase price was within Somerset's fair market value range and no other valuation is in the record, Defendants argue that there is no genuine dispute that they paid fair market value for the Summit Center. *Id.* at 14.

Acknowledging that Relator's own valuation arrived at a much lower figure than the Somerset Valuation, Defendants argue that Relator's valuation is not sufficient to create a genuine dispute of material fact for trial. *Id.* Defendants emphasize that the valuation took only a few hours, was merely a "ballpark" figure, and did not comply with industry standards for fair market valuation. *Id.* Defendants similarly argue that Timothy Smith, Relator's valuation expert, did not conduct a fair market valuation that can undermine the Somerset Valuation. *Id.* at 15. While Mr. Smith did offer "corrections" to the Somerset Valuation, Defendants argue that these corrections do not represent factual or mathematical errors in Somerset's work, but merely differing professional judgments that led to different forward-looking projections about the anticipated future cash flow of the Summit Center. *Id.* Mr. Smith, Defendants argue, neither opines that the Somerset Valuation did not comply with professional standards nor offers a competing conclusion of fair market value that complies with professional standards. *Id.* at 16.

Finally, Defendants argue that market evidence confirms the commercial reasonableness of the Somerset Valuation. *Id.* Citing a 2014 study prepared by Todd Mello, Defendants' valuation expert, which is also referenced in Relator's complaint (Doc. 56 ¶ 42), Defendants note that the prevailing applicable valuation multiple was between 6.0 and 8.0 times the expected earnings before interest, taxes, depreciation, and amortization ("EBITDA"). Doc. 86-1 at 16. Defendants argue that the EBITDA multiple used in the Somerset Valuation – 5.89 – suggests that it was not necessarily overstated and in need of correction as Mr. Smith opines. *Id.*

Relator argues that the record contains ample evidence that the purchase price of the Summit Center was commercially unreasonable. Doc. 88 at 11. He notes that the record does not contain *any* final conclusion regarding the Summit Center's fair market valuation because the Somerset Valuation is only a draft and was never finalized. *Id.* Relator further argues that he is not required to offer a competing fair market analysis conducted in accord with professional standards because a jury would not need to determine the fair market value of the Summit Center, only that the purchase price exceeded it. *Id.* at 11-12. Because Defendants paid the maximum amount supportable by the Somerset Valuation, Relator argues, a jury could find that Defendants paid more than fair market value based on evidence that the valuation was inflated. *Id.* at 12.

Relator asserts that even without his own valuation or the opinion of his expert, there is sufficient evidence that the valuation was inflated by about $1 million because Somerset assumed future capital expenditures of $900,000 over six years, but Defendants told the Coker Group that approximately $1,948,000 in replacement equipment would be required soon after the acquisition. *Id.* Relator further argues that Mr. Smith's analysis of the Somerset Valuation, though not a standalone fair market valuation, is sufficient to show commercial unreasonableness because it highlights many flaws in the valuation. *Id.* at 13. These include that Somerset relied almost entirely on information from the physician-owners without challenging it, projected no contract labor costs, failed to account for a clinical services management agreement, projected future case volume

increases despite NAHC predictions that case volume would decrease, failed to take account of 2014 year-end data revealing downward performance trends, contained no information on the practice life-stage and growth trends of physician utilizers, did not consider information on historical trends in the Summit Center's revenues or expenses, and did not contain a capacity analysis. *Id.* at 13-15.

Relator also argues that his own valuation, though not conclusive, is relevant to commercial reasonableness. *Id.* at 17. He argues that Defendants' arguments about his valuation and the correctness of his expert's opinions go to the weight of the evidence and are more appropriately made to a jury. *Id.* at 16-17.

In briefing and at oral argument, the parties agreed that the standard set out in *United States ex rel. Obert-Hong v. Advoc. Health Care*, 211 F. Supp. 2d 1045 (N.D. Ill. 2002), applies in this case. See Docs. 86-1 at 12, 88 at 11. Under *Obert-Hong*, "[t]o comply with the AKS, the hospital must simply pay fair market value for the practice's assets," and a court may "infer that any excess over fair value is intended to induce referrals." 211 F. Supp. 2d at 1049 & n.3.[1] Fair market value is generally defined as "the price a willing buyer would pay a willing seller . . . when neither is under compulsion to buy or sell." *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 678 (N.D. Ill. 2006). Fair market value in the context of the AKS, however, "may differ from traditional economic valuation formulae. Normally, we would expect the acquisition price to account for potential revenues from future referrals. Because the [AKS] prohibits any inducement for those referrals, however, they must be excluded from any calculation of

---

[1] Guidance issued by the Office of the Inspector General in 2005, cited elsewhere by Relator, raises questions about the propriety of *Obert-Hong*'s bright-line rule that a fair market value purchase price conclusively shows compliance with the AKS. *See* OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg. 4858, 4864 (Jan. 31, 2005) ("Importantly, under the anti-kickback statute, neither a legitimate business purpose for the arrangement, nor a fair market value payment, will legitimize a payment if there is also an illegal purpose."). The Court need not resolve this issue at this point because, even applying the more defendant-friendly standard of *Obert-Hong*, summary judgment must be denied. The parties may ask the Court to revisit whether the bright-line rule should be used in jury instructions before trial.

fair value here." *Obert-Hong*, 211 F. Supp. 2d at 1049 n.2; *see also United States ex rel. Perales v. St. Margaret's Hosp.*, 243 F. Supp. 2d 843, 849 (C.D. Ill. 2003) ("[T]he traditional or common methods of economic valuation do not comport with the prescriptions of the antikickback statute.  Items ordinarily considered in determining the fair market value may be expressly barred by the antikickback statutes' prohibition against payments for referrals.") (quoting U.S. Dep't of Health & Human Servs., Off. of Inspector Gen., Opinion Letter (Dec. 22, 1992)).

Relator's evidence creates a genuine issue of fact on whether Defendants paid fair market value for the Summit Center.  Relator offers the expert opinion of Mr. Smith that the Somerset Valuation was inflated by approximately $10 million.  Doc. 89-2 at 9.  Mr. Smith's report identifies specific ways that the figures used in the Somerset Valuation conflicted with other information available to or known by Defendants – including that it did not include known costs related to capital improvements and a management agreement – and explains the impact of these figures on the ultimate fair market value range.  *See id.* at 28-82.  Defendants do not argue that Mr. Smith is unqualified to offer these opinions or that his opinions are inadmissible.  Relator also offers his own valuation which, though high-level, is relevant to whether Defendants overpaid for the Summit Center.  Defendants do not argue that Relator – their vice president and CFO for 10 years – lacked the experience to do a general valuation or that his valuation is inadmissible.

Defendants' arguments that neither Mr. Smith nor Relator offers a full fair market valuation in compliance with professional standards does not persuade the Court that summary judgment is warranted.  Defendants cite no authority suggesting that Relator must offer a competing fair market valuation to show that Defendants overpaid for the Summit Center.  That neither Mr. Smith's opinions nor Relator's high-level valuation complies with professional standards for a full fair market valuation may be effective arguments for the jury, but they do not persuade the Court that it can disregard the opinions and valuation in ruling on Defendants' motion, particularly when the evidence must be viewed in the light most favorable to Relator.

Nor can the Court accept Defendants' argument the Mr. Smith's corrections to the Somerset Valuation are merely differences in professional judgment inherent in any fair market valuation.    Defendants emphasized this point during oral argument, calling valuation "part math, part art," and arguing that if quibbles over professional judgment could create a factual dispute, then no valuation could ever support summary judgment. But Mr. Smith does not rely merely on matters of opinion; he identifies concrete errors in Somerset's Valuation, including the omission or understatement of known costs.  This is more than quibbling with judgment, and creates a genuine factual dispute for trial.

Moreover, viewing the evidence in Relator's favor, the Court cannot conclude that the Somerset Valuation is a final conclusion of the Summit Center's fair market value. As Relator correctly points out, the valuation is a draft.  Defendants cite the testimony of Stephan Diagostino, who worked for Somerset and was one of the primary authors of the valuation (Doc. 90-1 at 3), that it was a final valuation.  Docs. 94 at 4.  A review of his deposition, however, makes clear that Mr. Diagostino said only that the valuation was final "as of the date recited in the report," not that it was final for all purposes.  *See* Doc. 94-1 at 6-7.  The valuation has a watermark stamp that reads "Draft 9/9/2014" on each page.  *See generally* Doc. 87-8.  Further, in the same deposition, Mr. Diagostino acknowledged the "Draft 9/9/2014" watermark and testified that a final version of the Somerset Valuation was never prepared because one was never requested from Somerset. Doc. 90-1 at 3.  And materials distributed for a September 11, 2014, Board of Directors meeting appear to acknowledge that the Somerset Valuation was not final.  *See* Doc. 87-9 at 7 (noting that "Somerset's final valuation report" was "pending receipt").  These facts could raise questions about the reliability of the valuation in the eyes of the jury.

In *Perales*, the court granted summary judgment in favor of the defendant on the issue of whether it had paid fair market value in its acquisition of several private medical practices.  243 F. Supp. 2d at 852.  The expert opinion offered by the relator did not condemn in any way the representative practice evaluation produced in discovery.  *Id.* at 849.  Nor did the relator's expert "offer any opinion that the evaluation resulted in the

payment of more than fair market value," and in fact the expert testified that he "had no problem at all with the methodology" used in the evaluation.  *Id.* at 849-50.  The court further noted that although the relator had asserted that the deposition of the defendant's CEO showed that the defendant purchased the practices to maintain physician allegiance and ensure that its business from the physicians would not go elsewhere, the text of the deposition did not support those assertions, "leaving his assertions fundamentally unsupported."  *Id.* at 850.

Relator offers more than the relator in *Perales*.  He offers an expert opinion that the Somerset Valuation contained flawed and unreasonable assumptions that resulted in an overstatement of the fair market value by approximately $10 million.  Doc. 89-2 at 9.  He offers his own high-level valuation of the Summit Center, which is far lower than the Somerset Valuation.  Doc. 89-1 at 5.  Defendants' arguments go to the weight this evidence should be given, but credibility determinations are the province of the jury.  Relator's evidence creates a triable issue regarding the fair market value of the Summit Center.  Summary judgment is not appropriate on this issue.

**B.    Scienter.**

Defendants argue that Relator cannot establish that Defendants committed a knowing and willful violation of the AKS.  Doc. 86-1 at 17.  Defendants assert that Relator must show they acted with "bad purpose and knowledge that their conduct was unlawful."  *Id.* (citing *United States v. Mathur*, No. 2:11-cr-00312-MMD-PA, 2012 WL 4742833, at *14-15 (D. Nev. Sept. 13, 2012).  Defendants argue that the AKS does not criminalize entering into a business transaction with the hope or expectation of increased referrals, only paying for referrals.  *Id.* at 18-19.

Defendants argue that Relator has neither direct nor circumstantial evidence that they acted knowingly and willfully.  Anticipating that Relator would point to the deposition testimony of NAHC board member Dick Kruse that NAHC hoped to increase referrals by acquiring the Summit Center, Defendants argue that his testimony reflects merely a desire or anticipation of referrals rather than payment for referrals.  *Id.* at 17-18.

1    Defendants argue that, in his deposition, Mr. Kruse was focusing primarily on a strategic

2    valuation of the Summit Center by Coker which did not form the basis of the ultimate

3    purchase price and therefore does not connect the desire for referrals to any remuneration.

4    *Id.* at 18.

5           Defendants also argue that to establish the requisite scienter through circumstantial

6    evidence, the evidence must be "robust," consist of "several actions inconsistent with a

7    good-faith belief that [their] conduct was legal," and "meaningfully exclude a legitimate

8    (or negligent) explanation for [their] conduct." *Id.* at 19 (quoting *Klaczak*, 458 F. Supp.

9    2d at 676; *United States ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-cv-3396, 2015 WL

10   5170874, at *23 (S.D. Tex. Sept. 3, 2015)).  Defendants assert that discovery has not

11   borne out Relator's allegations that decisionmakers considered and rejected his high-level

12   valuation or that another NAHC employee thought the company overpaid for the Summit

13   Center.  *Id.* at 20.  Defendants also point to Relator's deposition testimony, where he

14   conceded that during his employment at NAHC no one articulated a desire to provide

15   remuneration to the physician-owners for referrals.  *Id.* at 20-21.  Defendants argue that

16   the opinion of Relator's expert, Mr. Smith, that there were "red flags" in the Somerset

17   Valuation that Defendants should have identified is insufficient to show scienter.  *Id.* at

18   21.  They argue that "a failure to make due diligence inquiries, without more, cannot

19   satisfy the higher 'knowing and willful' standard" of the AKS.  *Id.*  Finally, Defendants

20   argue that "Defendants' course of action in engaging independent third-party experts

21   demonstrates, if anything, the intent to follow the law." *Id.* at 22.

22          Relator argues that he must show that Defendants acted knowingly and willfully in

23   offering or paying remuneration in exchange for referrals, but not that they knowingly

24   and willfully violated the AKS.  Doc. 88 at 18 (quoting *United States v. Valley Campus

25   Pharmacy, Inc.*, No. 2:16-cv-04777-MCS-PLA, 2021 WL 4816648, at *13 (C.D. Cal.

26   June 23, 2021)).  He also argues that he is not required to show that obtaining referrals

27   was the sole or primary purpose of the purchase.  *Id.* at 18-19 (citing *United States v.*

28

*Hong*, 938 F.3d 1040, 1048 (9th Cir. 2019); *United States v. Teva Pharms. USA, Inc.*, No. 13 Civ. 3702 (CM), 2019 WL 1245656, at *9 (S.D.N.Y. Feb. 27, 2019)).

Relator argues that discovery revealed direct evidence of Defendants' scienter. He first points to the deposition testimony of Mr. Kruse that Defendants discussed the fact that "orthopedic services would be an anchor service line for creating a strong patient base in getting referrals"; that capture of referrals which might otherwise go elsewhere was a "pivotal point of the valuation"; and that Defendants discussed "more loyalty from referrers" and increased referrals in connection with the transaction. *Id.* at 19. Relator also points to a draft PowerPoint presentation which includes multiple instances where references to referrals resulting from the transaction are stricken out, and Mr. Kruse's testimony that these topics were nevertheless considered. *Id.* at 19-20. Finally, Relator notes that minutes from a meeting of NAHC's Finance Committee, created some time after the transaction, state that "[i]t was understood that the purchase price [of the Summit Center] was on the high side[.]" *Id.* at 21.

Relator also presents evidence that Defendants knew core aspects of the Somerset Valuation were wrong, including anticipated capital expenditures, the omission of a clinical services management agreement, and projected annual case increases. *Id.* at 21. Relator argues that NAHC conducted no meaningful review of the Somerset Valuation, noting that although Defendants assert that Coker conducted a limited review, Yong Zhang, a senior manager at Coker, testified that Coker was not tasked with any review of the Somerset Valuation, and NAHC's controller and interim CFO each testified that they did not conduct any review of the Somerset Valuation. *Id.* at 22. Relator also notes that before the acquisition's closing date, additional available data showed downward performance trends, and yet Defendants made no effort to bring the Somerset Valuation up to date, despite testimony from both Defendants' and Relator's expert that they should have done so. *Id.*

The AKS imposes liability on those who "knowingly and willfully" offer or pay remuneration to induce the referral or recommendation of services that will be paid for at

least in part by a federal health care program.  42 U.S.C. § 1320a-7b(b)(2)(B).  In *United States v. Hong*, 938 F.3d 1040 (9th Cir. 2019), the Ninth Circuit suggested that the "knowing" requirement of the AKS can be met through proof of either actual knowledge or deliberate ignorance.  *Id.* at 1046.  *Hong* is consistent with the Ninth Circuit's model jury instruction for "deliberate ignorance."  That instruction provides that a jury may find "knowing" conduct where a defendant "was aware of a high probability" of illegal conduct and "deliberately avoided learning the truth."  *See* Manual of Model Criminal Jury Instructions § 4.9 (9th Cir. 2022).  These are instructions for criminal cases, but if deliberate ignorance can suffice to show knowing conduct in a criminal case, it certainly should suffice in a civil case.  Moreover, the parties agreed at oral argument that proof of deliberate ignorance could satisfy the knowing requirement of the AKS.

Relator has provided evidence from which a jury could find that Defendants acted with either actual knowledge or deliberate ignorance of their overpayment for the Summit Center for the purpose of securing referrals from the physician-owners.  Viewed in the light most favorable to Relator, this evidence shows that Defendants knew Relator had arrived at a far lower valuation than Somerset (Doc. 89-1 at 5, 12-13); relied on the Somerset Valuation that was merely a draft (Docs. 87-8, 90-1 at 3); knew the valuation did not incorporate updated and available data and omitted known costs including capital and management agreement costs (Doc. 89-2 at 2);[2] knew the valuation was not reviewed internally (Docs. 92-4 at 9-11, 92-5 at 7) or by another qualified source (Doc. 92-3 at 9-10); viewed securing referrals from the physician-owners as a pivotal point of the valuation (Doc. 92-2 at 15); discussed referrals in connection with the transaction (*id.* at 14-19); struck references to referrals from their internal PowerPoint presentation, suggesting they knew consideration of referrals was improper (Doc. 93 at 10, 13, 19, 20);

---

[2] During oral arguments, Defendants argued that their internal discussions about the capital costs that would be needed if they acquired the Summit Center were irrelevant to the purchase price.  But if the purpose of the Somerset Valuation was to determine a fair price for the facility, the capital improvements needed after acquisition were plainly relevant to the price.  Indeed, Somerset included an estimate of required improvements.  A jury could find that Defendants knew the significantly lowered figure used in the Somerset Valuation was incorrect and caused the ultimate value range to be overstated.

knew at the time of the purchase that the price was "on the high side" (Doc. 93-5 at 2); and, in the years after the acquisition, took three consecutive $8 million impairment charges on the Summit Center, confirming that they paid too much for it (Doc. 92-2 at 22).[3]  All of this evidence could lead a reasonable jury to find that Defendants knowingly paid more than fair market value to induce continued referrals by the physician-owners.

To establish a violation of the AKS, Relator must also show that Defendants acted willfully.  Subsection (h) of the AKS makes clear that to establish willful conduct "a person need not have actual knowledge of [the AKS] or specific intent to commit a violation of [it]."  § 1320a-7b(h).  Subsection (h) was added to the statute in 2010 to clarify "confusion in the case law over the appropriate meaning of 'willful' conduct." *Mathur*, 2012 WL 4742833, at *15 (quoting 155 Cong. Rec. 10853 (daily ed. Oct. 28, 2009) (statement of Rep. Kaufman discussing predecessor bill to the Patient Protection and Affordable Care Act, the Health Care Enforcement Act of 2009)).  Before the addition of (h), a majority of courts held that "knowingly" meant to do something voluntarily or deliberately, not by mistake or accident, and "willfully" meant "to do something purposely with the intent to violate the law, or to do something purposely that the law forbids." *Id.* at *14 (discussing *United States v. Baystate Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20 (1st Cir. 1989)).  The Ninth Circuit, however, had concluded that "willfully" required proof that a defendant violated a known legal duty. *Id.*  The addition of subsection (h) specifically nullified decisions of the "Ninth Circuit . . . [which] read the term ['willfully'] to require proof that the defendant not only intended to engage in unlawful conduct, but also knew of the particular law in question and intended to violate that particular law." *Id.* at *15 (quoting 155 Cong. Rec. 10853).

Defendants cite *Mathur* as establishing that Relator must prove that Defendants acted with knowledge that their conduct was unlawful.  Doc. 94 at 6.  But the court in

---

[3] Mr. Kruse testified that an impairment charge is taken when an auditor looks at a business's balance sheet and determines that the fair market value of an asset is less than what is listed on the balance sheet – a process Mr. Kruse characterized as "a huge hit." Doc. 92-2 at 22.

1
2
3
4
5
6
7
8
9

*Mathur* did not settle on a final test for willfulness under the AKS, though it did suggest that the First Circuit's test might be correct after the addition of subsection (h).  *See Mathur*, 2012 WL 4742833, at *15.  Assuming the First Circuit's test applies – and that Relator must show that Defendants acted with the intent to violate the law or to do something purposely that the law forbids – Relator has produced sufficient evidence to meet it.  Indeed, Relator's evidence shows that Defendants had actual knowledge of the AKS and its requirements.  The AKS was mentioned in name and substance in both the Somerset Valuation (Doc. 87-8 at 7) and the ultimate asset purchase agreement by which Defendants acquired the Summit Center (Doc. 87-16 at 9, 24).

10
11
12
13
14
15
16
17

The draft presentation supports Relator's claim that Defendants acted with the intent to violate the law or to do something purposely that the law forbids – pay an excessive price for the Summit Center in order to induce the physician-owners to provide continuing referrals to Defendants.[4]  The presentation was produced by Defendants in discovery, is titled "Orthopedic Institute and Summit Surgery Center Transaction," and states on the first page that it was prepared for presentation to NAHC's Strategy and Finance Committees on October 22 and 23, 2014.  Doc. 93 at 2.  Revisions to the presentation include the following relevant strike-outs:

18
19
20
21

- In a slide considering the "critical" orthopedic service line responsible for "$15 million of the $18 million profit at FMC": "Orthopedic services is an 'anchor' service line for creating a strong patient base in ~~getting referrals for~~ the NAH[C] market area." *Id.* at 10.

22
23

- In a list of "[a]ttributes" of a comprehensive continuum of orthopedic and spine care: "~~Broad referral base and more loyalty from referrers.~~" *Id.* at 13.

24
25
26

- In a slide titled "Market Assessment": "There is no comprehensive integrated orthopedic and spine service offering in the NAH[C] market area[.]   ~~This~~

27
28

---

[4] As the parties made clear at oral argument, the "referrals" at issue in this case were surgeries performed by doctors at Defendants' facilities, including the Summit Center, which was renamed Northern Arizona Orthopedic Surgery Center LLC ("NAOSC") after the purchase.

1    ~~integrated service is anticipated to increase referral volume and create a strong~~

2    ~~base of ongoing referrals.~~" *Id.* at 19.

3    • In a slide titled "Critical Success Factors": "Creation and branding a continuum of

4    Ortho and Spine services – to enhance marketing opportunities and allow for

5    promotion of NAH[C]/FMC as a premier provider for comprehensive and

6    convenient orthopedic services ~~entice patients, referring providers and payors to~~

7    ~~keep patients local~~[.]" *Id.* at 20.

8    While Defendants contest whether they were responsible for drafting or editing of this

9    presentation, Mr. Kruse testified that creation of such a presentation would generally be

10   done within the finance group at NAHC.  Doc. 92-2 at 14.  A reasonable jury could find

11   from the presentation's date (during Defendants' consideration of the transaction), its title

12   and content, the fact that it was prepared for NAHC's Strategy and Finance Committees,

13   its production by Defendants in discovery, and Mr. Kruse's testimony that it was in fact

14   created by Defendants.  And the focused and deliberate strike-outs of all references to

15   referrals would support a finding that Defendants knew their conduct was unlawful,

16   particularly in light of the fact that Defendants knew of the AKS.

17   Defendants liken Relator's evidence of scienter to the "few ambiguous emails"

18   that were insufficient to avoid summary judgment in *Ruscher*.  2015 WL 5178074, at

19   *23.  The court in that case observed that the relator's "only evidence of bad intent" were

20   some emails in which defendants expressed a desire to resolve billing disputes quickly

21   and described the need to be "sensitive" to an upcoming contract renewal in pursuing a

22   collections strategy.  *Id.* at *15.  The defendants later forgave most of the disputed debt,

23   which the relator asserted was intended to induce renewals.  *Id.*  The court found that the

24   emails suggested only that the defendants were "interested in a quick resolution to the

25   dispute in order to preserve the parties' business relationship" and that the amount owed

26   was in question.  *Id.* at *15-16.  This is quite unlike the situation presented here.  As

27   detailed above, Relator has produced evidence suggesting that obtaining referrals was a

28   significant motivation of the acquisition, that Defendants excised mentions of referrals

from written materials while knowing of the AKS and its requirements, and that Defendants paid an excessive amount for the Summit Center.

Viewing the evidence in the light most favorable to Relator and drawing all reasonable inferences in his favor, a reasonable jury could find that Defendants knowingly and willfully overpaid for the Summit Center to secure referrals in violation of the AKS.

### C.   Causation.

Defendants argue that Relator's theory – that every claim submitted to a government payor by Defendants or a physician-owner after the transaction is false – is too broad and lacks a causal link between the alleged kickback and any allegedly false claim made to the government.  Doc. 86-1 at 22-23.  Defendants emphasize the "resulting from" language of the AKS and argue that a kickback does not morph into a false claim unless a patient is exposed to an illegal referral and a claim for reimbursement is submitted pertaining to that patient.  *Id.* at 23 (citing *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 100 (3d Cir. 2018)).  Defendants argue that nothing in discovery suggests that physician-owners were influenced by the purchase price of the Summit Center to make any referral, pointing to testimony from Dr. Timothy Bonatus – one of the physician-owners – that the physicians had a longstanding relationship with FMC, the only hospital in the area.  *Id.* at 23-24.

Defendants in essence argue that to survive summary judgment, Relator must show but-for causation between the kickback and a claim submitted to a government payor.  *Id.* at 24.  They argue that Relator asserts a mere temporal relationship – that is, that claims were submitted after an alleged kickback – which is not sufficient to support causation at the summary judgment stage.  *Id.*  Defendants argue that Relator "can point to no evidence that the physician-owners' referral habits changed in any way as a result of the alleged kickback."  *Id.*  Defendants also assert that Relator has not identified any specific claims that resulted from a violation of the AKS.  *Id.*

Defendants argue that they cannot be held liable for claims submitted by physician-owners themselves ("provider claims"), only for claims actually submitted by one or more of the Defendants ("facility claims").[5] *Id.* at 25. Acknowledging that they can be liable for claims they "knowingly assisted in causing the government to pay," Defendants argue that this liability exists only where a party delegates authority to another to submit claims on their behalf. *Id.* Because there is no evidence that Defendants delegated authority to the physician-owners to submit claims on their behalf, they argue, they cannot be liable for claims submitted by the doctors.

Relator argues that he is not required to show but-for causation, only that there was a kickback followed by the physician-owners performing surgeries at Defendant's new surgery center, even if the surgeries would have been performed absent the kickback. Doc. 88 at 25-26 (citing *Teva*, 2019 WL 1245656, at *26). Relator also argues that he has in fact identified specific allegedly false claims in a report prepared by Drs. Ronald Luke and Brian Piper (the "Luke and Piper Report"), which identifies facility and provider claims submitted for work done by physician-owners at Defendants' facilities after the date of the acquisition. *Id.* at 25; *see also* Doc. 93-3. The Luke and Piper Report identifies an average of 153 of these claims submitted per month to government payors. Doc. 88 at 25.

Relator argues that, even if some additional link is required between the kickback and the false claims, it exists in this case because of a non-compete clause in the asset purchase agreement that restricted the physician-owners' dealings with other orthopedic outpatient centers in Flagstaff for three years after closing. *Id.* at 27.[6] Relator argues that

---

[5]   The distinction appears to be between what the doctors would bill Medicare or another government service for performing the surgery, and what the facility would bill for hosting the surgery and any after-care.

[6] Under the non-compete clause, the physician-owners agreed not to directly or indirectly, own, operate, finance, manage, control, develop, be a director, officer or employee of, have a compensation arrangement with, or provide consulting or administrative services to (i.e., be "involved in") any facility or entity performing orthopedic outpatient surgery services within a forty (40) mile radius of Flagstaff Medical Center or Verde Valley Medical Center for a three (3) year period after closing, with the exception of a particular surgery center in Prescott, Arizona, in which some physician-owners had pre-existing interests. Doc. 87-16 at 18.

absent this provision, the physician-owners would likely have performed surgeries elsewhere. *Id.* In support of this argument, Relator notes that soon after the non-compete expired some of the physician-owners opened a competing ambulatory surgical center in Flagstaff. *Id.* With regard to at least the claims during the three-year period during which the non-compete was effective, Relator argues, there is a direct causal link between the alleged kickback (the excessive price paid for the center) and the claims submitted by the doctors for work at NAOSC and FMC. *Id.*

Finally, Relator argues that Defendants can be liable for provider claims submitted for services performed at their facilities. *Id.* at 29. Relator argues that he must show only that the provider claims "actually sat in the causal chain," not that they were submitted with delegated authority. *Id.* He argues that surgeries typically result in claims submitted both by providers and facilities and that the facility claims are claims Defendants "presented" and the provider claims are claims Defendants "caused to be presented." *Id.* (citing 31 U.S.C. § 3729(a)(1)(A); *Teva*, 2019 WL 1245656, at *24).

The AKS provides that "a claim that includes items or services *resulting from* a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA.]" § 1320a-7b(g). The AKS therefore imposes a causation requirement on FCA claims premised on AKS violations. What a relator must show to meet this requirement, however, is not clear from the language of the statute. The parties have cited, and the Court has found, no Ninth Circuit guidance on how to prove causation for FCA claims premised on AKS violations. The Third Circuit's decision in *Greenfield* appears to be the leading authority on this issue.

In *Greenfield*, the relator alleged that the defendant, a specialty pharmacy providing home care for hemophilia patients, made donations to two hemophilia-related entities to induce the recommendation of its services to their members. 880 F.3d at 92. In affirming the district court's grant of summary judgment to the defendant, the court rejected a causation standard based on mere temporal proximity, holding that "[the relator] may not prevail on summary judgment simply by demonstrating that [the

defendant] submitted federal claims while allegedly paying kickbacks." *Id.* at 99. But the court also rejected a but-for causation standard, holding that the relator "does not need to prove [the entities'] referrals actually caused their members to use a particular healthcare provider." *Id.* at 98. Some "link" is required," "but it is less than" the but-for standard asserted by the defendant. *Id.*

To show causation, the court held that a relator "must point to at least one claim that covered a patient who was recommended or referred to [the defendant] by [the entities receiving kickbacks]." *Id.* at 99. The court reasoned that "[a] kickback does not morph into a false claim unless a particular patient is exposed to an illegal recommendation or referral and a provider submits a claim for reimbursement pertaining to that patient." *Id.* at 100. Although the relator had shown that the defendant submitted claims for 24 federally insured patients, he had not shown "that any of the 24 received a referral or recommendation to use [the defendant's] services or even that any of the 24 were members of [the entities]" to which the defendant had made contributions. *Id.* The court accordingly found that the relator had not sufficiently linked the alleged kickbacks to the submitted claims. *Id.*

The key conclusions of *Greenfield* have been followed by most courts considering this issue. First, but-for causation is not required. *See, e.g., United States ex rel. Fitzer v. Allergan, Inc.*, No. 1:17-CV-00668-SAG, 2022 WL 846211, at *9 (D. Md. Mar. 22, 2022), *amended on denial of reconsideration,* No. 1:17-CV-00668-SAG, 2022 WL 1567645 (D. Md. May 18, 2022) ("[N]o court has adopted Allergan's preferred but-for cause standard."); *United States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, No. 13-cv-3003 (WMW/DTS), 2021 WL 101193, at *10 (D. Minn. Jan. 12, 2021) (collecting cases rejecting but-for causation standard and noting "Defendants cite *no* case in which a court has held that an AKS violation must be the but-for cause of a false claim") (emphasis in original); *United States ex rel. Bawduniak v. Biogen Idec, Inc.*, No. 12-CV-10601-IT, 2018 WL 1996829, at *3 (D. Mass. Apr. 27, 2018) ("Relators need not show that a quid pro quo exchange occurred, or that the physicians would not have prescribed

Defendant's medication but for the kickbacks."). Second, mere temporal proximity is not enough. *Fitzer*, 2022 WL 846211, at *9 ("[C]ourts have also rejected the attempt Relator makes to stretch the proximate cause standard to categorically include any and all claims "tainted" by an AKS violation."). Third, the "middle of the road" approach set out in *Greenfield* – requiring some "link" beyond mere temporal proximity – has generally been embraced. *Teva*, 2019 WL 1245656, at *24; *Fitzer*, 2022 WL 846211, at *9.[7]

There is some ambiguity in what sort of "link" is required to meet this standard. But in cases where the doctor who actually received the alleged kickback then uses the defendant's services, courts have found a sufficient causal link. For example, in *Bawduniak* the relators alleged that the defendant paid kickbacks to physicians in the form of consulting and speaking fees to induce them to prescribe the defendant's drugs. 2018 WL 199682, at *1.[8] Citing *Greenfield*, the *Bawduniak* court found that it was "sufficient to show that [the d]efendant paid kickbacks to a physician for the purpose of inducing the physician to prescribe specific drugs, and that the physician then prescribed those drugs[.]" *Id.* at *4. Similarly, in *Teva* the relators alleged that the defendant paid kickback to physicians through a speaking program meant to induce them to prescribe the defendant's drugs. 2019 WL 1245656, at *1. The court found that the relators could survive summary judgment "because they have shown that [the defendant] paid kickbacks to specific physicians . . . for the purpose of inducing them to prescribe [the defendant's drugs], and that the providers then prescribed those drugs." *Id.* at *27. The court found that such evidence "raised an inference of causation – albeit not the strongest one – that a jury may use to find liability." *Id.*

*Bawduniak* and *Teva* are consistent with *Greenfield*'s requirement that a relator show some causal link beyond merely temporal proximity, but short of but-for causation.

---

[7] Courts in other FCA contexts have applied a tort-inspired proximate cause standard and find sufficient causation where an act is "a substantial factor in the sequence of responsible causation, and if the [result] is reasonably foreseeable or anticipated as a natural consequence." *United States ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 681 (N.D. Miss. 2015). Neither party in this case has argued for such a standard.

[8] Although *Bawduniak* was decided on a motion to dismiss, it considered the causation question in a way the Court finds helpful.

In both cases it was clear that the patients had actually been exposed to the compromised professional judgment of the bribed physicians because those very physicians had prescribed the defendants' drugs.  In *Greenfield*, by contrast, there was nothing from which to conclude that the patients had any contact at all with the entities whose professional judgment had allegedly been compromised by kickbacks.

Defendants argue that Relator must come forward with evidence that the referral habits of the physician-owners changed as a result of the alleged kickback or that specific surgeries were performed at their facilities because of their alleged overpayment.  But this is functionally equivalent to a but-for requirement.  In accord with the weight of authority, some of which is cited above, the Court finds that Relator is not required to show but-for causation to prevail on his FCA claims.  *Greenfield*, 880 F.3d at 98; *Teva*, 2019 WL 1245656, at *26.  Relator is, however, required to show more than a mere temporal relationship between Defendants' overpayment for the Summit Center and the claims ultimately made to the federal government.  *Greenfield*, 880 F.3d at 98.

Viewing the evidence in the light most favorable to Relator and drawing all reasonable inferences in his favor, a jury could find a sufficient causal link between the alleged overpayment from defendants to the physician-owners and the claims later submitted.  Relator has produced evidence that the very physicians who allegedly received money from Defendants in the form of an excessive purchase price later used Defendants' facilities.  The Luke and Piper Report shows that the physician-owners performed hundreds of surgeries on patients at Defendants' facilities after the transaction closed.  This evidence includes the link that was missing in *Greenfield*: patients in this case were actually exposed to compromised professional judgment – the decisions of their doctors to use Defendants' facilities.  Relator has also produced evidence that the non-compete provision of the purchase agreement at least made it more likely that the physician-owners would perform their surgeries at Defendants' facilities.  A jury could find that the non-compete significantly reduced the chances that other facilities would be constructed in the Flagstaff market, drawing the physician-owners' surgeries away from

Defendants.  At oral argument, Defendants emphasized that the non-compete did not limit where the physician-owners could perform their surgeries and that there were other facilities available in the market.  But this could be viewed as strengthening the causal link that can be inferred from Relator's evidence: the physician-owners who received inflated payments from Defendants could have performed surgeries elsewhere but instead performed them at Defendants' facilities.

Defendants argue that the surgeries could have been performed at Defendants' facilities for a variety of reasons other than the allegedly excessive payments – for example, due to emergencies, the good reputation of the facilities, the location of the facilities, or insurance company requirements.  These are certainly viable arguments that Defendants may use to persuade the jury that they should find no causal link between the purchase price and the claims.  But the existence of alternative explanations does not defeat the fact that Relator's evidence permits a reasonable inference that the overpayment for the Summit Center was linked to the subsequent claims for federal reimbursement.  Ultimately, causation is a fact issue that must be resolved by a jury.

The Court would reach the same conclusion under a proximate cause tort standard. From the evidence discussed above, a reasonable jury could find that the inflated purchase price was a substantial factor in causing the physician-owners to perform surgeries at Defendants' facilities.  Similarly, a jury could conclude that the physician-owners' decisions to perform surgeries at Defendants' facilities were reasonably foreseeable and natural consequences of the excessive purchase price.

The Court is not convinced, however, that Relator has sufficiently linked the alleged kickback to claims submitted for surgeries performed by physician-owners on patients admitted through an emergency room.  Relator conceded during oral argument that these claims are identifiable and could be removed should the Court find summary judgment on them appropriate.  The Court finds the claims related to surgeries performed as a result of emergency room admission to be more comparable to the claims in *Greenfield* – it is not clear that the surgeries allowed any professional judgment to enter

into the patients' treatment given that they were performed in emergent circumstances. The Court will accordingly grant summary judgment in favor or Defendants as to the surgeries performed by physician-owners on emergency room patients.

The Court also has doubts about whether Defendants can be held liable for claims submitted to the federal government by the physician-owners for surgeries performed by the physician-owners.  The doctors presumably would have submitted those claims regardless of where they performed the surgeries – at Defendants' facilities or elsewhere – and it is therefore difficult to see how the allegedly excessive purchase price could have had any effect on the claims.  The Court therefore doubts that a causal link can be drawn between such claims and the purchase price.  The Court does not find, however, that the parties' briefing provides a sufficient basis to grant summary judgment on this issue. Defendants can raise this issue again in a motion in limine before trial if they choose to do so.

**IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 86) is **granted** as to claims submitted for emergency room surgeries, and **denied** in all other respects.  The Court will schedule a conference call with the parties to set a trial date.

Dated this 15th day of June, 2022.

David G. Campbell
Senior United States District Judge